UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMR (USA HOLDINGS), INC.,

                Plaintiff,

        -against-

KEN GOLDBERG and NEIL GOLDBERG,

                Defendants.

**OPINION AND ORDER**
18 Civ. 07849 (ER)

Ramos, D.J.:

      EMR (USA Holdings), Inc. ("EMR") brings this action against Ken and Neil Goldberg (the "Goldbergs") for contractual indemnity against both Ken and Neil and for specific performance of contract against Ken. Before the Court is the Goldbergs' motion to dismiss all claims under Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), 12(b)(7), or, in the alternative, to dismiss or stay the action either under *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976) or on collateral estoppel grounds.

      For the reasons set forth below, the Court GRANTS the Defendants' motion to dismiss the indemnity claims under Federal Rule of Civil Procedure 12(b)(1) without prejudice and DENIES the motion with respect to the claim for specific performance.

## I.    BACKGROUND

### A.  Factual Background

      EMR is the United States holding company for a global scrap-metal-recycling business. Complaint ¶ 8. It operates throughout the United States through its regional operating companies. *Id*. The Goldbergs owned a scrap-metal recycling business, Gold Metal Recyclers, which was based in Texas and operated throughout the South and Southwest via various entities

(together, "Gold Metal'). *Id.* ¶ 9.  On August 31, 2011 the Goldbergs sold Gold Metal and all of its assets to EMR for more than $100,000,000.  *Id.* ¶ 10.  The transaction was executed pursuant to a Contribution and Sale Agreement (the "Sale Agreement").  *Id.*  As per the Agreement, a new company, EMR Gold Recycling, LLC ("EMR Gold") was formed, of which EMR eventually owned 100% membership interest. *Id.* ¶ 12.

The Sale Agreement contained a provision that all of Gold Metal's "Confidential Information" comprised "valuable assets" and that, after the transaction was complete, EMR would have exclusive ownership of this information.  *Id.* ¶ 15; Pinker Decl., Ex. 3 (the Sale Agreement) § 5.9.  According to EMR, "[t]he Confidential Information was a material component of the transaction, and if the Confidential Information had not been as represented, EMR would not have engaged in the sale transaction on the terms reflected in the Sale Agreement (if at all)."  Farnsworth Aff. ¶ 9.  The Confidential Information was valued at ███████. *Id.* ¶ 10.

The Sale Agreement contained a representation that each seller "has good and indefeasible title to all of the assets it purports to own." Complaint ¶ 14 (quoting the Sale Agreement § 3.3).  The Goldbergs had a continuing obligation "not to make use of such information for [their] own purposes or for the benefit of [anyone else]."  Complaint ¶ 16 (quoting the Sale Agreement § 5.9).  The Goldbergs also had a continuing obligation to "use reasonable efforts to cause [their] representatives" to treat the confidential information with the same care.  *Id.* (quoting the Sale Agreement § 5.9).  All representations, warranties, covenants, and agreements were to "survive indefinitely."  Complaint ¶ 17.  The Sale Agreement provided for specific performance of the contract and allowed recovery for reasonable attorney's fees and costs.  *Id.* ¶ 27.

The Sale Agreement also contained an indemnity provision running from the Goldbergs to EMR.  As per the indemnity provision, the Goldbergs were to "hold EMR and its affiliates harmless from any and all 'out-of-pocket Liabilities, obligations, claims, contingencies, damages, costs and expenses' that EMR or its affiliates may suffer or incur as a result of or relating to any seller's breach of representation, warranty, covenant, or agreement.'"  *Id.* ¶ 18 (quoting the Sale Agreement § 7.1).  These obligations were joint and several.  *Id.*

As part of the sale transaction, EMR executed two other agreements with the Goldbergs on September 14, 2011, both of which had their own confidential information provisions.  Pinker Decl., Ex. 2 (Texas Complaint) (hereinafter the "Texas Complaint") ¶¶ 42-48.  Under the Amended and Restated Limited Liability Company Agreement (the "JV Agreement") between EMR Gold and Gold Metal, the Goldbergs became managers of EMR Gold.  *Id.* ¶ 42.  The JV Agreement provided that "[e]ach Member and Manager acknowledges and agrees that . . . []'Confidential Information'[] [is] the property of [EMR Gold]."  *Id.* ¶ 43.  The Goldbergs also became co-Chief Executive Officers, and as such, Ken executed an Employment Agreement with EMR Gold.[1]  *Id.* ¶ 45.  The Employment Agreement also contained a provision regarding the safekeeping of confidential information.  *Id.* ¶ 46.

In 2017, Ken and his son, Richard, started a new scrap-metal-recycling business, Geomet Recycling ("Geomet").  Complaint ¶ 20.  EMR alleges that Ken used its confidential information to start the business, including customer and supplier lists, employee information, sales data, and so forth, and that he continues to use this information to the detriment of EMR.  *Id.* ¶¶ 20-22, 25. Ken has stated that, in his opinion, "supplier and consumer information is not confidential or proprietary."  *Id.* ¶ 23.  EMR alleges that this statement conflicts with what the Goldbergs

---

[1] It is unclear whether Neil also executed such an agreement, as he is not named in the Texas case.

represented in the Sale Agreement.  *Id.* ¶ 24.  It maintains that such information is confidential, but to the extent that it is not, the Goldbergs "breached representations and warranties and covenants and agreements made in the [Sale] Agreement."  *Id.* ¶ 26.

### B.  The Texas Litigation

This is not the only litigation spurred by Ken's formation of Geomet.  On October 13, 2017, EMR and its operating companies, including EMR Gold, sued Geomet, Ken, and eleven other previous employees of EMR Gold in Texas State Court (the "Texas case").  In that case, EMR and the other plaintiffs bring the following eight causes of action:  (1) violation of the Texas Uniform Trade Secrets Act by EMR against all Defendants; (2) breach of fiduciary duty by EMR Gold against Ken; (3) breach of fiduciary duty by all plaintiffs other than EMR against all defendants other than Ken and Geomet; (4) tortious interference with existing contracts; (5) tortious interference with employee contracts by Gold Metal and EMR against Ken; (6) breach of contract by EMR Gold against Ken; (7) conspiracy; and (8) an application for a temporary restraining order and temporary injunction.

These claims spring from various alleged misuses of EMR's confidential information. The confidential information at issue is both the information that was purchased by EMR in the Sale Agreement, as well as confidential information developed after the sale transaction.  *See, e.g.*, Texas Complaint ¶ 56 ("Each of these entities continued to develop confidential, proprietary, and trade-secret information after the sale transaction in addition to the information that EMR . . . purchased from the Goldbergs and their affiliates.").  As part of that litigation, EMR and the operating companies entered into a Mutual Partial Assignment Agreement (the "Assignment Agreement"), whereby EMR gave each of its operating companies a ▮ interest in the claims and intellectual property at issue in that case.  Pinker Decl., Ex. 17 (Affidavit of David

Farnsworth and Assignment Agreement) (assigning a ▮ interest ratably to each of the nine operating companies).

There is currently a temporary injunction in place in the Texas litigation that prevents the defendants in that action from using any confidential information and trade secrets they may have acquired from the plaintiffs. *See* Pinker Decl., Ex. 4 (Texas Temporary Restraining Order). With respect to Ken, the confidential information includes all information covered by § 5.9 of the Sale Agreement, as well as information covered by the JV and Employment Agreements. *Id.* ¶ 11. The defendants in that case filed a motion to dismiss under Texas state law. The trial court denied the motion, and the appeals court affirmed in part and reversed in part on August 22, 2019. Doc. 110, Ex. 1 (Decision in *Richard Goldberg, et al. v. EMR (USA Holdings) Inc., et al.*, No. 05-18-00261-CV (Tex. Ct. App.—Dallas Aug. 22, 2019) (hereinafter "Texas Court of Appeals Decision").

### C. Procedural History

EMR filed this action against Ken and Neil Goldberg on August 28, 2018. It brings three causes of action: (1) contractual indemnity against Ken; (2) contractual indemnity against Neil; and (3) specific performance of contract against Ken. On January 22, 2019, the Goldbergs filed the instant motion to dismiss for lack of ripeness, failure to join indispensable parties, and lack of venue, or, in the alternative, to stay or dismiss the action under *Colorado River*. *See* 424 U.S. 800. The Goldbergs requested leave to amend their motion to dismiss on August 27, 2019 to add collateral estoppel as a ground for dismissal in light of the Texas Court of Appeals Decision. Doc. 105. The Court allowed supplemental briefing on the issue, to be considered at its discretion. The Court will consider each of these bases to dismiss in turn.

## II.    LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate the case.  Fed. R. Civ. P. 12(b)(1).  The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  "On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits . . . ." *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *see also Morrison*, 547 F.3d at 170 (citing *Makarova*, 201 F.3d at 113).  When evaluating a motion to dismiss for lack of subject matter jurisdiction, the court accepts all material factual allegations in the complaint as true but does not draw inferences from the complaint favorable to the plaintiff. *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citing *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir. 1998)).

### B.  Federal Rule of Civil Procedure 12(b)(3)

"When a defendant challenges either the jurisdiction or venue of the court, the plaintiff bears the burden of showing that both are proper." *Casville Invs., Ltd. v. Kates*, No. 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001); *Savoy Senior Hous. Corp. v. TRBC Ministries*, 401 B.R. 589, 596 (S.D.N.Y. 2009)).  To meet this burden, the plaintiff must plead facts sufficient for a prima facie showing of jurisdiction or venue. *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355

(2d Cir. 2005) (quoting *CutCo Indus. v. Naughton*, 806 F.2d 361, 364–65 (2d Cir.1986)).  The

"court may examine facts outside the complaint to determine whether venue is proper.  The court

must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff."

*Concesionaria DHM, S.A. v. Int'l Fin. Corp.*, 307 F. Supp. 2d 553, 555 (S.D.N.Y. 2004)

(quoting *E.P.A. ex rel. McKeown v. Port Auth.*, 162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001)).

### C.  Federal Rule of Civil Procedure 12(b)(7)

Under Rule 12(b)(7), an action must be dismissed for failure to join a party under Rule 19

if the absent party is (1) necessary but joinder is not feasible, and (2) indispensable to the

action.  *See Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724-25 (2d Cir. 2000).  In determining a

Rule 12(b)(7) motion, a court may accept all factual allegations in the complaint as true and draw

inferences in favor of the plaintiff.  *Am. Trucking Ass'n, Inc. v. N.Y. State Thruway Auth.*, 795

F.3d 351, 354 (2d Cir. 2015).  Furthermore, a court can consider matters outside the pleadings,

such as affidavits, in deciding a 12(b)(7) motion.  *Holland v. Fahnestock & Co., Inc.*, 210 F.R.D.

487, 495 (S.D.N.Y. 2002).

## III.  DISCUSSION

### A.  Motion to Dismiss for Lack of Ripeness

"Ripeness is jurisdictional in nature and therefore properly considered on a motion to

dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules."

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 294 (S.D.N.Y.

2003).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not

occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300

(1998) (internal quotations and citations omitted).  The "basic rationale" for the ripeness doctrine

"is to prevent the courts, through avoidance of premature adjudication, from entangling

themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967),

*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

"Often, the best way to think of constitutional ripeness is as a specific application of the

actual injury aspect of Article III standing." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d

682, 688 (2d Cir. 2013). The first requirement of constitutional standing is that "the plaintiff

must have suffered an injury in fact—an invasion of a legally protected interest which is (a)

concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v.*

*Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and citations omitted). "[T]o

say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is

not 'actual or imminent' but instead 'conjectural or hypothetical.'" *Nat'l Org. for Marriage*, 714

F.3d at 688 (quoting *Lujan*, 504 U.S. at 560).

The Goldbergs argue that the indemnity claims against both Ken and Neil, as well as the

specific performance claim against Ken are unripe because they are predicated on underlying

findings or actions that have yet to pass. Doc. 59 at 9-11. The Court considers this argument as

it applies to both the indemnity causes of action and the specific performance cause of action.

### 1.  Counts I-II:  Contractual Indemnity Against Ken and Neil

The Sale Agreement's indemnity clause provides, in relevant part, that

> [T]he Sellers, jointly and severally, shall indemnify, defend and hold harmless
> EMR . . . from any and all out-of-pocket Liabilities, obligations, claims,
> contingencies, damages, costs and expenses, including all court costs, litigation
> expenses and reasonable attorneys' fees, but excluding any damages or claims
> that are incidental, consequential, speculative or punitive . . . that any EMR Party
> may suffer or incur as a result of or relating to:  (a) the breach of any
> representation or warranty made by the Sellers in this Agreement . . . ; [or] (b) the
> breach of any covenant or agreement of any Seller in this Agreement . . . .

Sale Agreement § 7.1. "EMR seeks indemnity from Ken [and Neil] to restore it to the position it

would have been in had Ken [and Neil] performed under the Agreement." Complaint ¶¶ 35, 42.

8

It alleges that it "began suffering losses no earlier than 2017, when Ken began using EMR's Confidential Information in violation of his obligations under the Agreement." *Id.* ¶¶ 33, 40.

"[A] claim for indemnity . . . requires that an actual liability be sustained by the indemnitee . . . ." *Atl. Richfield Co. v. Interstate Oil Transp. Co.*, 784 F.2d 106, 112 (2d Cir. 1986) (quoting *The Toledo*, 122 F.2d 255, 257 (2d Cir. 1941)). "New York law clearly provides that a claim for indemnification or contribution is premature where there has been neither entry of judgment nor payment." *Armored Grp., LLC v. Homeland Sec. Strategies, Inc.*, No. 07 CV 9694 (LAP), 2009 WL 1110783, at *3 (S.D.N.Y. Apr. 21, 2009) (quoting *IntelliSec v. Firecom, Inc.*, No. 00 Civ. 3557 (ILG), 2001 WL 218940, at *12 (E.D.N.Y. Feb. 1, 2001)). There is an exception to this rule, "for the sake of fairness and judicial economy, the CPLR [Civil Practice Law Rules] allows third-party actions to be commenced in certain circumstances before they are technically ripe, so that all parties may establish their rights and liabilities in one action." *Mars Assocs., Inc. v. New York City Educ. Constr. Fund*, 126 A.D.2d 178, 192 (1st Dep't 1987).

The Goldbergs argue that EMR's claims for indemnification against both Ken and Neil are not ripe because the Agreement's indemnification clause is only triggered by a finding of damages due to breach of the Agreement. That breach is the subject of the Texas case and remains to be adjudicated, meaning that EMR has yet to establish any out-of-pocket losses to be indemnified. Therefore, any finding of indemnification would be premature. Doc. 59 at 9-11. EMR in turn argues that "[t]he claims are essentially for breach of contract, as [the Goldbergs] both undertook contractual indemnity obligations" and that the claims are ripe because EMR has already been injured, whether or not the confidential information was misused. Doc. 65 at 8. Furthermore, it argues that breach of the Sale Agreement is not before the Texas court and that

the claims at issue in this litigation are wholly independent from those in the Texas litigation. *Id.*
at 7-11.

"It is black letter law in New York that an indemnification claim does not arise until the
party seeking indemnification has an out-of-pocket loss to be reimbursed." *Bank of India v.*
*Trendi Sportswear, Inc.*, No. 89 CIV. 5996 JSM, 2002 WL 84631, at *4 (S.D.N.Y. Jan. 18,
2002).  EMR alleges two theories of potential loss:  either (1) the information was not
confidential, in which case EMR has suffered loss due to a breach of representation or warranty;
or (2) the information was confidential and EMR has suffered loss due to a breach of a covenant
or agreement.  The question before the Court is whether EMR has alleged non-hypothetical out-
of-pocket liabilities related to these two theories of loss for which it can be indemnified.  The
Court finds that EMR has not alleged such liabilities arising from either scenario.

###### a.  Breach of Representation or Warranty If the Information Was Not Confidential

EMR allegedly paid over ████████ for existing customer and supplier relationships.
Farnsworth Aff. ¶ 10.  This information "was a material component of the transaction, and if the
Confidential Information had not been as represented, EMR would not have engaged in the sale
transaction on the terms reflected in the Sale Agreement (if at all)." *Id.* ¶ 9.  EMR argues that
because of this breach of representation, it "has already been damaged because it did not acquire
what the Goldbergs represented it would acquire." Doc. 65 at 10.  However, it also indicates that
any such losses were not suffered before 2017.  Complaint ¶¶ 33, 40.

The Goldbergs argue that these allegations represent a claim for fraud, which EMR has
explicitly disavowed.  Doc. 70 at 3-4; Doc. 65 at 28.  Though these allegations may sound in
fraud, they may also sound in breach of representation or warranty of a contract, causes of action
to which EMR repeatedly refers in its Complaint. *See, e.g.*, Complaint ¶¶ 31, 38.  Therefore, the

Court will proceed as if the potential underlying actions sound in breach of representation or warranty rather than fraud.

Even assuming this alleged breach of representation or warranty has been established, the only out-of-pocket liability the Court can identify is the ███████ EMR paid to acquire the confidential information at issue. Yet the Complaint does not specify that EMR seeks to recover this ██████ (or, rather, the difference between what it paid and what the information was actually worth). First of all, this liability was incurred in 2011, not post-2017. Complaint ¶¶ 33, 40. Second, as per the Complaint, EMR seeks "indemnity from Ken [and Neil] to restore it to the position it would have been in had Ken [and Neil] performed under the Agreement, including for all loses suffered as a result of or relating to any seller's breach of a representation or warranty, or covenant or agreement." Complaint ¶¶ 35, 42. It does not ask the Goldbergs to restore it to the position it would have been in had the Sale Agreement not happened at all. The record is silent as to what the out-of-pocket losses associated with liabilities incurred post-2017 might be. There has been no adjudication of these damages or of the potential underlying actions. Therefore, the Court agrees with the Goldbergs that the liability underlying any indemnity claim has not accrued in this scenario, and that any out-of-pocket loss is, at this juncture, hypothetical.

**b. Breach of the Confidentiality Agreement If the Information Was Confidential**

Under EMR's second scenario, assuming that the information at issue was confidential, it argues that it should be indemnified for out-of-pocket losses or liabilities for breach of the Sale Agreement. The Goldbergs argue that any such breach is the subject of the Texas litigation and has yet to be adjudicated.

EMR is correct that the court in the Texas case will not have to decide whether the Sale Agreement was breached.  The Texas Complaint contains eight causes of action, and breach of the Sale Agreement by EMR against Ken is not one of them.  Yet that is not to say that the Sale Agreement is not at issue in Texas.  For example, in its claim for tortious interference in Texas, EMR seeks damages based, in part, on Ken's use of confidential information, as defined by the Sale Agreement.  Texas Complaint ¶ 154.  And in its application for a temporary restraining order and temporary injunction, EMR points to the Sale Agreement's provision allowing for injunctive relief and asks that the injunction cover confidential information Ken acquired as part of the Sale Agreement.  *Id.* ¶¶ 177, 196.  The facts needed to determine whether the Goldbergs breached the Sale Agreement will undoubtedly overlap with those needed to determine liability in the Texas action.  However, EMR is correct that the Texas court will not necessarily need to determine whether the Sale Agreement was breached and what contractual damages stem from that breach.  Therefore, the Court agrees with EMR that the outcome of the Texas litigation will not necessarily determine liabilities for which it can be indemnified under the Sale Agreement.

But neither are such liabilities pled in this action.  The Goldbergs present extensive case law in support of their position that an underlying liability must be established before a claim for indemnity becomes ripe.  Doc. 59 at 9-11; Doc. 70 at 1-4.  EMR takes issue with the Goldbergs' case law but provides no case law of its own in opposition.  Doc. 65 at 10-11.  Instead, it claims that "[a]ccrual of the claims before this Court are for contractual indemnity arising from the indemnitors' own failure to comply with their contractual duties."  *Id.* at 11.  "Because of those breaches, EMR has already suffered out-of-pocket damages."  *Id.*  In spite of these cursory allegations as to damages, EMR presents this Court with neither a judgment finding that the Goldbergs failed to comply with their contractual duties, nor payment of any expenses.  In other

words, it fails to specify what these "out-of-pocket damages" might be.  As such, the Court is unaware of any out-of-pocket loss EMR has already suffered as a result of breaches of the Sale Agreement—or, indeed, whether the Sale Agreement was breached at all.

Therefore, the Court again agrees with the Goldbergs that any liabilities giving rise to indemnity claims have yet to accrue, assuming the information at issue is indeed confidential.

***

For the foregoing reasons, the Court finds that Counts I and II of EMR's complaint are unripe as currently pled and dismisses these claims without prejudice.

### 2.  Count III:  Specific Performance Against Ken

The Sale Agreement provides in relevant part that:

> [T]he failure of any party to perform its agreements and covenants hereunder . . . will cause irreparable injury to the other parties for which damages, even if available, will not be an adequate remedy.  Accordingly, each party hereby consents to the issuance of injunctive relief by any court of competent jurisdiction to compel performance of such party's obligations and to the granting by any court of the remedy of specific performance of its obligations hereunder . . . .

Sale Agreement § 8.10.  Unlike the claims for indemnity, the claim for specific performance is not predicated on an existing finding of damages or out-of-pocket liabilities, but rather on a finding of a "failure . . . to perform . . . [the] agreements and covenants."  The Court finds that EMR has properly alleged that Ken failed to perform under the agreement and that, therefore, this cause of action is ripe for review.

### B.  Motion to Dismiss for Improper Venue

The Goldbergs argue that dismissal is warranted under Rule 12(b)(3) because EMR waived the forum selection clause in the Sale Agreement.  The forum selection clause states that:

> The Parties agree that any suit or proceeding arising under this Agreement or the transactions contemplated hereby must be brought in a court of competent

jurisdiction located in New York, New York.

Sale Agreement § 8.11.  The Texas case concerns breaches of the Employment and JV

Agreements, which were attached to the Sale Agreement, as well as general misconduct related

to confidential information as defined by the Sale Agreement.  In the alternative, the Goldbergs

request that the case be transferred to the Northern District of Texas pursuant to 28 U.S.C. §

1404(a).  Doc. 59 at 16-22.

### 1.  Wavier of the Forum Selection Clause

"[T]he Second Circuit has held that a forum-selection clause is 'presumptively

enforceable' if the moving party can demonstrate that:  (1) the clause was 'reasonably

communicated to the party resisting enforcement'; (2) the clause is mandatory, rather than

permissive, in nature; and (3) the clause encompasses the plaintiff's claims."  *Pence v. Gee Grp.,*

*Inc.*, 236 F. Supp. 3d 843, 851 (S.D.N.Y. 2017) (citing *Phillips v. Audio Active Ltd.*, 494 F.3d

378, 383 (2d Cir. 2007)).  If these conditions are satisfied, the clause must be enforced unless the

party opposing transfer makes a "sufficiently strong showing that enforcement would be

unreasonable or unjust, or that the clause was invalid for such reasons as fraud or

overreaching."  *Martinez v. Bloomberg LP*, 740 F.3d 211, 221 (2d Cir. 2014) (quoting *Phillips*,

494 F.3d at 383-84).  "A forum-selection clause [must] be 'given controlling weight in all but the

most exceptional cases."  *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571

U.S. 49, 59-60 (2013) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S.  22, 33 (1988)

(Kennedy, J., concurring)).

But "[u]nder New York law, when a party brings suit in a forum not explicitly authorized

by a forum selection clause, it waives any jurisdictional argument it may have had based on the

clause."  *Beach v. Citigroup Alt. Invs. LLC*, No. 12 Civ. 7717 (PKC), 2014 WL 904650, at *8

(S.D.N.Y. Mar. 7, 2014) (citing *Ill. Union Ins. Co. v. NRG Energy, Inc.*, No. 10 Civ. 5743 (BSJ)
(DCF), 2010 WL 5187749, at *2 (S.D.N.Y. Dec. 6, 2010); *Pirolo Bros. v Angelo Maffei & Figli
SAS*, No. 87 CIV. 7561 (MBM), 1989 WL 20945, at *2 (S.D.N.Y. Mar. 2, 1989)).  Courts have
found that "when a party disregards a forum selection clause and sues on a contract in an
unauthorized forum, it waives the forum selection clause only for the specific claim it pursues."
*Wachovia Bank Nat'l Ass'n v. EnCap Golf Holdings, LLC*, 690 F. Supp. 2d 311, 328 (S.D.N.Y.
2010) (quoting *Pirolo Bros.*, 1989 WL 20945, at *2).

The central disagreement between the parties on this issue boils down to whether, even if
the Texas case was covered by the Sale Agreement's forum selection clause, the clause was
waived only with respect to those claims or to all ensuing actions.  Without deciding whether the
Texas case falls within the forum selection clause, the Court finds that to the extent EMR waived
the forum selection clause by pursuing the Texas litigation, it did so only with regard to the
claims at issue in Texas.  In *Pirolo Bros., Inc.*, for example, the court found that where Pirolo's
commission was not at issue in New York litigation, Maffei had not "waived its right to have the
issue of Pirolo's commissions litigated in Avellino, Italy."  1989 WL 20945, at *2.  The same
result is warranted here.

The Goldbergs urge that *Pirolo Bros.* is inapplicable because two later cases "contain no
qualification limiting waiver to specific claims pursued."  Doc. 59 at 17 n.9 (citing *In re Rationis
Enters.*, No. 97 CV 9052 (RO), 1999 WL 6364, at *2-3 (S.D.N.Y. Jan. 7, 1999); *Diesel Props
S.r.l. v. Greystone Bus. Credit II LLC*, No. 07 Civ. 9580 (HB), 2008 WL 4833001, at *15
(S.D.N.Y. Nov. 5, 2008)).  However, as EMR argues, neither of these cases explicitly disavows
limiting waiver to the specific claims pursued.  Moreover, both of these cases were decided
before *Atlantic Marine*, which "clarified the deference owed to forum selection clauses."  *Allianz*

15

*Glob. Corp. & Specialty v. Chiswick Bridge*, Nos. 13-cv-7559-RA, 13-cv-7565-RA, 2014 WL 6469027, at *3 (S.D.N.Y. Nov. 17, 2014). More recent cases, such as *Tulepan v. Roberts*, No. 14-cv-8716 (KBF), 2014 WL 6808313 (S.D.N.Y. Dec. 3, 2014), and *Wachovia Bank*, 690 F. Supp. 311, further emphasize that *Pirolo Bros.* is still good law.

*Illinois Union Ins. Co.*, which the Goldbergs also cite in support of their motion, is inapposite. 2010 WL 5187749. There, the Court found that plaintiffs had waived the forum selection clause because *the instant suit* was not filed in a proper forum. In that case, defendants brought suit in the Middle District of Louisiana, and plaintiff brought suit in the Southern District of New York. The Southern District found that the forum selection clause required the plaintiff to bring suit in New York State Court. *Id.* at *1-2. Therefore, plaintiff had waived the forum selection clause by not bringing the instant suit in the correct forum. The Goldbergs make no analogous argument here. In other words, they do not argue that EMR waived the forum selection clause by filing in *this* Court, but rather that they previously waived the clause by filing in Texas. As discussed above, the Court does not agree.

Therefore, the Court finds that EMR has not waived the forum selection clause. Because of the deference owed to forum selection clauses, the Court finds that venue is proper. *See generally Atl. Marine*, 571 U.S. 49.

### 2.  Transfer Under 28 U.S.C. § 1404(a)

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." 28 U.S.C. § 1404(a). Section 1404(a) allows a court to transfer a civil action to the more convenient district court if the action presents issues and requires witnesses that make one district more convenient than another. *Wy1er-Wittenberg v. MetLife Home Loans, Inc.*, 899 F.

16

Supp. 2d 235, 248 (E.D.N.Y. 2012) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).

Section 1404(a) is only available when the court initiating the transfer is the proper venue and

has personal jurisdiction over the defendant.  *Kelly-Brown v. Winfrey*, 11 Civ. 07875 (PAC),

2013 WL 6574918, at *1 (S.D.N.Y. Dec. 12, 2013) (citing *Lafferty v. St. Riel*, 495 F.3d 72, 76–

77 (3d Cir. 2007)).

However, when an enforceable forum selection clause exists, courts must "deem the

private-interest factors to weigh entirely in favor of the preselected forum."  *Atl. Marine Const.

Co.*, 571 U.S. at 582.  This leaves a district court to consider only public-interest factors.  "These

factors include 'the administrative difficulties flowing from court congestion,' 'the local interest

in having localized controversies decided at home,' and 'the interest in having the trial of a

diversity case in a forum that is at home with the law.'"  *Tulepan*, 2014 WL 6808313 (quoting

*Atl. Marine*, 571 U.S. at 62 n.6).  "Because those factors will rarely defeat a transfer motion, the

practical result is that forum-selection clauses should control except in unusual cases."  *Id.*

(quoting *Atl. Marine*, 571 U.S. at 64).  The Court finds that this is not such an unusual case, and

that these factors do not outweigh the deference afforded to an enforceable selection clause.[2]

Therefore, the Court denies the Goldbergs' motion to transfer the case pursuant to 28

U.S.C. § 1404(a).

### C.  Motion to Dismiss for Failure to Join Indispensable Parties

The Goldbergs ask the Court to dismiss the Complaint under Rule 12(b)(7), which is a

motion to dismiss for "failure to join a party under Rule 19."  Fed. R. Civ. P. 12(b)(7).  Rule 19

establishes a two-step test for determining whether an action must be dismissed for failure to join

---

[2] The Goldbergs again cite to *Illinois Union Ins. Co.* in support of their motion to transfer.  2010 WL 5187749.
There, the Court found that public interest factors favored transfer *after* finding that plaintiff had waived the forum
selection clause.  Such is not the case here.

an indispensable party. *See Viacom Int'l*, 212 F.3d at 724. First, the Court must determine

"whether an absent party belongs in the suit," and thus, is "necessary" under Rule

19(a). *Id.* Under Rule 19(a)(1), an absent party is "required" if:

> (A) in that person's absence, the court cannot accord complete relief among existing
> parties, or (B) that person claims an interest relating to the subject of the action and
> is so situated that disposing of the action in the person's absence may (i) as a
> practical matter impair or impede the person's ability to protect that interest; or (ii)
> leave an existing party subject to a substantial risk of incurring double, multiple, or
> otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). If the absent party is not necessary, then the Court need not go on to the

next step. *Viacom Int'l*, 212 F.3d at 724. If the absent party is necessary but joinder is not

feasible (for example, for jurisdictional reasons), then the Court must determine whether the

absent party is indispensable under Rule 19(b). *Id.* at 725. If the absent party is indispensable,

then the Court must dismiss the action. *Id.* Rule 19(b) instructs the Court to consider the

following factors to determine whether an absent party is indispensable:

> (1) the extent to which a judgment rendered in the person's absence might prejudice
> that person or the existing parties; (2) the extent to which any prejudice could be
> lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the
> relief; or (C) other measures; (3) whether a judgment rendered in the person's
> absence would be adequate; and (4) whether the plaintiff would have an adequate
> remedy if the action were dismissed for non-joinder.

Fed. R. Civ. P. 19(b).

The Goldbergs argue that EMR has "strategically" omitted the nine other plaintiffs in the

Texas case—its operating companies, which are citizens of Texas—in order to artificially create

diversity jurisdiction before this Court. Doc. 59 at 12. They argue that the operating companies

are necessary and indispensable parties because not only does EMR conduct business through

the entities, but they have an ownership interest in the confidential information at issue through

the Assignment Agreement signed in the Texas Case. *Id.* at 12-15; Assignment Agreement ¶ 1.

At the very least, the Goldbergs argue, EMR Gold is a required party because it is a signatory to the Sale Agreement, which is indisputably at issue here.  Doc. 59 at 15-16.  The Court will consider the eight non-signatory operating companies and EMR Gold separately.

### 1.  The Non-Signatory Operating Companies

"A party is necessary if any one of Rule 19(a)'s three criteria are met."  *Davidson Well Drilling, Ltd. v. Bristol-Myers Squibb Co.*, No. 09 Civ. 1431 (SAS), 2009 WL 2135396 (S.D.N.Y. July 16, 2009).  "The Second Circuit requires the absentee to assert its own interest relating to the subject of the action in order to satisfy Rule 19(a)(1)(B)."  *Artists Rights Enf't Corp. v. Estate of Robinson*, 15 Civ. 9878 (ER), 2017 WL 933106, at *9 (S.D.N.Y. March 8, 2017).  Here, none of the operating companies have asserted an interest in this litigation.  Therefore, the Court considers whether the parties are necessary under Rule 19(a)(1)(A), which provides that a party must be joined if "in that person's absence, the court cannot accord complete relief among existing parties."

 The Goldbergs argue that this cannot be achieved for two reasons:  (1) because EMR's business operations "flow through the Operating Companies"; and (2) because the Operating Companies have ownership interests in the allegedly confidential information at issue in this litigation.  Doc. 59 at 13-14.  The Court considers each of these arguments.

 The Goldbergs cite *Mattera v. Clear Channel Communications, Inc.* in support of their proposition that because EMR conducts business through the operating companies they are required parties.  239 F.R.D. 70 (S.D.N.Y. 2006).  In *Mattera*, the Court found that Capstar, a New York radio station operating company, was a necessary and indispensable party where it was a joint employer of most putative class members and where its *own* compensation structure was at issue in the suit.  *Id.* at 74-77 (finding that "[i]t is difficult to see how Mattera could be

19

accorded complete relief without Capstar, the entity that employs and, moreover, pays and makes charge backs to the wages of, members of the putative class").  In that case, the Court found not simply that Defendants conducted business through Capstar, but rather that Capstar was an actual employer in an employment case.  Here, there is no analogous dispute regarding the operating companies.  Indeed, as EMR maintains, it "is suing for misrepresentations made **to EMR**, not for misrepresentations made to the Operating Companies."  Doc. 65 at 14.  The same defect can be found in the Goldbergs' citation to *Rubler v. Unum Provident Corp.*, No. 04 Civ. 7102 (DC), 2007 WL 188024 (S.D.N.Y. Jan. 25, 2007).  There, the Court found that "First Unum's absence might be prejudicial to it or to plaintiff, as it is difficult to imagine how the issue of whether First Unum breached its obligations under the Policies would be resolved without its participation in the litigation." *Id.* at *2.  The fact that First Unum's parent company would remain in the case could not "compensate for First Unum's absence." *Id.* at *3.  In this case, however, the operating companies are not necessary to resolving the dispute between EMR and the Goldbergs, since their actions are not at issue.

Next, the Goldbergs maintain that the operating companies are required parties because they are signatories to the Assignment Agreement in the Texas case, which gives them ownership interests over the same confidential information at issue here.  The Assignment Agreement in that case provides in relevant part that:

> Whereas, each of the Parties owns:  (1) certain intellectual property relating to the operations of its business, including but not limited to:  customer, prospect and market lists, sales or other data, intellectual property, employee information, proprietary information, trade secrets, operational information . . . intellectual property of any kind, and other confidential or proprietary information related in any way to any of the Parties or their affiliates; in addition to (2) legal claims, damages, causes of action, actions, or other related legal rights asserted in and relating to the [Texas] lawsuit . . . which are, collectively, referred to as the "***Claims***") . . . EMR (USA Holdings) Inc. hereby assigns a ██████████ interest in its Claims ratably to [the nine operating companies].

20

Assignment Agreement at 1.  The Goldbergs argue that there is an overlap in the confidential information covered by the Assignment Agreement and the confidential information at issue in this lawsuit, which covers customer lists, supplier lists, employee information, sales data, pricing and margins information, and strategic hedging information.  Doc. 59 at 13-14; Complaint ¶ 20. They further argue that because the operating companies are owners of this information, the Goldbergs could be subject to "additional legal challenges based on the same legal theories and claims pled in this lawsuit," putting them at risk of "incurring double or otherwise inconsistent obligations."  Doc. 59 at 15.

The Texas case is undoubtedly broader than this case, as it concerns both confidential information acquired from the Goldbergs and information developed after the sale transaction took place.  However, the confidential information at issue in this case—particularly employee and supplier information—necessarily overlaps with at least some of the confidential information at issue in Texas.  Therefore, even though EMR has undoubtedly chosen to pursue different theories of liability in the Texas case, the operating companies do have an interest in this litigation as per the Assignment Agreement, namely a ███ interest in the confidential information at issue.

The question before the Court then is whether this ███ interest is enough to make the operating companies necessary parties.  EMR argues that "[i]t is not enough under Rule 19(a)(2)(i) [Rule 19(a)(1)(B)(i), as amended in 2007] for a third party to have an interest, even a very strong interest in the litigation."  Doc. 65 at 15 (citing *MasterCard Int'l. Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 387 (2d Cir. 2006)).  But the Court is not conducting its analysis under Rule 19(a)(1)(B)(i), which asks whether a third party's "ability to protect [its] interests would be impaired ***because of*** that party's absence from the litigation."  *MasterCard Intern Inc.*,

471 F.3d at 387.  Here, the Court is being asked to consider whether the Goldbergs, not the

operating companies, will be prejudiced by a decision in the absence of the operating companies.

Their interest in the confidential information is only relevant to the extent it indicates that they

may have rights to bring some future action requesting the same relief under the Sale Agreement.

Therefore, *MasterCard* is inapposite.  Given that the operating companies do own a ▮ interest

in the confidential information at issue here, the Court will assume that they are necessary

parties.

Because joinder of these parties would destroy diversity, the Court must then consider

whether these parties are indispensable under Rule 19(b).  To reiterate, in making this

determination, the Court considers four factors:

> (1) the extent to which a judgment rendered in the person's absence might prejudice
> that person or the existing parties; (2) the extent to which any prejudice could be
> lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the
> relief; or (C) other measures; (3) whether a judgment rendered in the person's
> absence would be adequate; and (4) whether the plaintiff would have an adequate
> remedy if the action were dismissed for non-joinder.

Fed. R. Civ. P. 19(b).

As to the first factor, the Court finds that due to the nature of the relationship between

EMR and the operating companies, there would be no prejudice to any party involved.  As EMR

argues, it can adequately represent the interests of its wholly owned subsidiaries.  This would

cause prejudice neither to the operating companies, nor to the existing parties.  In finding that

this is the case, the Court does not purport to pierce the corporate veil or ignore corporate

formalities, as the Goldbergs suggest.  Rather, it simply finds that EMR and the operating

companies both have the same interests in protecting their confidential information and that these

interests are aligned, as evidenced by the fact that they are represented by the same counsel in the

Texas case.

These facts are analogous to those in *Artists Rights Enforcement Corp.*, 2017 WL

933106.  Even though that case was decided on Rule 19(a)(1)(B) grounds, it is still instructive

here.  There, the Court found that "prejudice to absent parties approaches the vanishing point

when the remaining parties are represented by the same counsel, and when the absent and

remaining parties' interests are aligned in all respects."  *Id.* at *9 (quoting *Am. Trucking Ass'n,

Inc.*, 795 F.3d at 360).  The Goldbergs argue that *Artists Rights Enforcement Corp.* is

inapplicable here because the operating companies are signatories to a contract at issue in this

case—the Assignment Agreement.  The Court disagrees.  Even though the Assignment

Agreement concerns, in part, the same confidential information at issue in the Sale Agreement,

this lawsuit does not concern any rights or remedies arising from that Agreement.

Moreover, the absence of the operating companies would not prejudice the existing

parties.  The Goldbergs argue that they will be prejudiced because "complete relief (*i.e.* dismissal

of claims with prejudice) cannot be accorded in the Operating Companies' absence."  Doc. 59 at

14.  This is because the operating companies "could subject the Goldbergs to additional legal

challenges based on the same legal theories and claims pled in this lawsuit."  *Id.* at 15.  The

Court is unconvinced.

The operating companies are clearly in privity with EMR and would be bound by any

judgment from this court.  "Privity is a well-established component of the federal law

of *res judicata.*  A privy is bound with respect to all the issues that were raised or could have

been raised in the previous lawsuit."  *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d

343, 346 (2d Cir. 1995).  Therefore, the risk of additional legal challenges is minimal.  The Court

is sympathetic to the Goldbergs' claim that "for *res judicata* to apply the Goldbergs would first

have to engage in subsequent litigation to obtain a ruling holding that the elements of *res*

*judicata* and/or piercing the corporate veil/alter ego are satisfied." Doc. 70 at 8. However, this presupposes that the operating companies—which are wholly owned by EMR—would bring such subsequent litigation, when it is so plainly doomed to fail. The risk of frivolous litigation is not unique to the Goldbergs.

This case can also be distinguished from *Vedder Price Kaufman & Kammholz v. First Dynasty Mines, Ltd.*, which the Goldbergs cite in support of their position that the absence of the operating companies would cause them prejudice. No. 01 CIV. 3970 (WHP), 2001 WL 1190996 (S.D.N.Y. Oct. 9, 2001). There, the Court found that a third-party subsidiary was indispensable, in part, because of defendant's "interest in avoiding duplicative litigation and inconsistent determinations with respect to the validity of the fee agreement." *Id.* at *2. The Court found that "[w]ere this Court to rule adversely to FDM-Canada on the issue of contract validity, FDM-Cayman is likely to be bound under principles of issue preclusion because it is in privity with FDM-Canada, its ultimate corporate parent." *Id.* Therefore, "the effect of the doctrines of issue and claim preclusion on a parallel, subsequently-filed state court action would unnecessarily complicate and enlarge what otherwise would be a relatively straightforward contract action in a single court." *Id.*

Here, however, the pending state court action does not sound in contract, but rather in tort. Although similar fact issues—such as whether the information at issue is actually confidential—may be decided in both actions, joining this action to that in Texas would not necessarily result in "straightforward" litigation. Moreover, in *Vedder Price*, the subsidiary, FDM-Cayman, had "a more prominent role in the underlying dispute than its parent. In addition . . . documents submitted . . . suggest[ed] that FDM-Cayman also ha[d] a greater interest in the claim of offset." *Id.* at *3. Such is not the case here, where the main dispute is between EMR

24

and the Goldbergs, EMR has a greater interest in the confidential information, and the operating companies' actions are not at issue.

For these same reasons, the third Rule 19(b) factor also weighs in favor of keeping the case. "[A]dequacy refers to the 'public stake in settling disputes by wholes, whenever possible.'" *Republic of Philippines v. Pimentel*, 553 U.S. 851, 870 (2008) (quoting *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111 (1968)). Because the operating companies would be bound by any judgment in this Court, there is little threat of piecemeal litigation. *Cf. id.* at 870-71 ("Going forward with the action without the Republic and the Commission would not further the public interest in settling the dispute as a whole because the Republic and the Commission would not be bound by the judgment in an action where they are not parties.").

Finally, the fourth factor weighs in favor of dismissal, as EMR could undoubtedly seek an adequate remedy in Texas state court, where there is already a related action pending. "However, the availability of an alternative forum is not dispositive." *Davidson Well Drilling*, 2009 WL 2135396, at *4.

Weighing the factors above, the Court finds that the non-signatory operating companies are not indispensable parties for purposes of Rule 19.

### 2. EMR Gold

The Goldbergs further argue that, at the very least, EMR Gold is a necessary party, as it is a signatory to the Sale Agreement, which is indisputably at issue in this litigation. Doc. 59 at 15-16. "It is well-established that a party to a contract which is the subject of the litigation is considered a necessary party." *Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp. 2d 369 (S.D.N.Y. 2000). In response, EMR argues that EMR Gold is diverse because it is a citizen of the United

Kingdom, not Texas, for the purposes of diversity and that therefore, dismissal under Rule
12(b)(7) is unwarranted.  Doc. 65 at 16-17.

EMR Gold is a limited liability company.  For purposes of diversity jurisdiction, a limited
liability company has the citizenship of each of its members.  *Handelsman v. Bedford Vill.
Assocs. Ltd. P'ship*, 213 F.3d 48, 51-52 (2d Cir. 2000) (citing *Cosgrove v. Bartolotta*, 150 F.3d
729, 731 (7th Cir. 1998)).  EMR Gold is wholly owned by EMR Financing, LLC.  EMR
Financing, LLC, in turn, is wholly owned by European Metal Recycling USA Holdings Limited
("European Metal"), a UK private limited company.  Farnsworth Aff. ¶¶ 4-5.

A UK private limited company is treated as a corporation for the purposes of diversity
subject matter jurisdiction, *SHLD, LLC v. Hall*, No. 15 Civ. 6225 (LLS), 2015 WL 5772261, at
*2 (S.D.N.Y. Sept. 29, 2015), and is "deemed to be a citizen of . . . the State or foreign state
where it has its principal place of business," 28 U.S.C. § 1332(c).  In *Hertz Corp. v. Friend*, the
Supreme Court concluded that the phrase, "'principal place of business' refers to the place where
the corporation's high level officers direct, control, and coordinate the corporation's activities."
559 U.S. 77, 80 (2010).  The Court explained:

> [I]n practice it should normally be the place where the corporation maintains its
> headquarters—provided that the headquarters is the actual center of direction,
> control, and coordination, *i.e.*, the "nerve center," and not simply an office where
> the corporation holds its board meetings (for example, attended by directors and
> officers who have traveled there for the occasion).

*Id.* at 93; *see also St. Paul Fire & Marine Ins. Co. v. Scopia Windmill Fund, LP*, 87 F. Supp. 3d
603, 605 (S.D.N.Y. 2015) ("[T]he test focuses on where a corporation's 'high-level' decisions
are made, not where day-to-day activities are managed.").

As described in the Farnsworth Affidavit, "European Metal['s] . . . principal place of
business [is] in Warrington, England.  The Warrington headquarters are the center of European

Metal's direction, control, and coordination and, so far as European Metal is concerned, its principal place of business."  Farnsworth Aff. ¶ 5.  For diversity purposes at this stage of the litigation, the Court will consider EMR Gold to be a citizen of the United Kingdom.

Therefore, EMR Gold, though a necessary party, would not destroy diversity.

*** 

For the reasons stated above, the Court denies the Goldbergs' motion to dismiss under Rule 12(b)(7).

### D. *Colorado River* **Abstention**

"Generally, as between state and federal courts, the rule is that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the [f]ederal court having jurisdiction . . . .'"  *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976) (quoting *McClellan v. Carland,* 217 U.S. 268, 282 (1910)).  Abstention from exercising federal jurisdiction "is the exception, not the rule."  *Id.* at 813.  In *Colorado River,* the Supreme Court explained that "[t]he doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, *is an extraordinary and narrow exception* to the duty of a District Court to adjudicate a controversy properly before it."  *Id.* (internal quotation marks omitted) (emphasis added) (quoting *Cty. of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–89 (1959)).  In *Colorado River*, the Court held that "in situations involving the contemporaneous exercise of concurrent jurisdictions," a federal court, in "exceptional" circumstances, may abstain from exercising jurisdiction when parallel state-court litigation could result in "comprehensive disposition of litigation" and abstention would conserve judicial resources.  *Id.* at 813, 817–18 (internal quotations and citations omitted).  "[T]he decision whether to dismiss a federal action because of parallel state-court litigation does

27

not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983).

"In evaluating whether *Colorado River* abstention is appropriate, federal district courts are to consider six factors, 'with the balance heavily weighted in favor of the exercise of jurisdiction.'" *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 100 (2d Cir. 2012) (quoting *Moses H. Cone*, 460 U.S. at 16) (internal quotation marks omitted).  These six factors are:

> (1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights.

*Woodford v. Cmty. Action Agency of Greene Cty., Inc.*, 239 F.3d 517, 522 (2d Cir. 2001) (internal quotations and citations omitted).  The Supreme Court has explained that none of these factors alone is necessarily determinative, but, instead, a federal district court must engage in a "carefully considered judgment[,] taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise . . . . Only the clearest of justifications will warrant dismissal." *Colorado River,* 424 U.S. at 818–19 (citation omitted); *see also Moses H. Cone*, 460 U.S. at 16 (explaining that the "weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case.").  Moreover, "[w]here a *Colorado River* factor is facially neutral, that 'is a basis for retaining jurisdiction, not for yielding it.'" *Niagara Mohawk Power Corp.*, 673 F.3d at 101 (quoting *Woodford*, 239 F.3d at 522).

Before engaging in the six-factor analysis, a court must make a threshold determination that the federal and state court cases are "parallel." *Dittmer v. Cty. of Suffolk*, 146 F.3d 113, 118 (2d Cir. 1998) ("[A] finding that the concurrent proceedings are 'parallel' is a necessary prerequisite to abstention under *Colorado River*." (citations omitted)).  Federal and state proceedings are "parallel" for abstention purposes when the two proceedings "are essentially the same," meaning that "there is an identity of parties, and the issues and relief sought are the same." *Shields v. Murdoch*, 891 F. Supp. 2d 567, 577 (S.D.N.Y. 2012) (citation and internal quotation marks omitted).  Nevertheless, "[p]erfect symmetry of parties and issues is not required.  Rather, parallelism is achieved where there is a substantial likelihood that the state litigation will dispose of *all* claims presented in the federal case." *Id.* (quoting *In re Comverse Tech., Inc.*, No. 06 Civ. 1849 (NGG) (RER), 2006 WL 3193709, at *2 (E.D.N.Y. Nov. 2, 2006)) (emphasis in original) (internal quotation marks omitted).  Further, if the court has "any doubt" regarding the parallel nature of the two actions, the outcome should be resolved in favor of exercising federal jurisdiction.  *Id.*  Finally, "[i]f a court finds that the federal and state cases are not parallel, '*Colorado River* abstention does not apply, whether or not issues of state law must be decided by the federal court.'" *Id.* (quoting *In re Comverse Tech., Inc.*, 2006 WL 3193709, at *4).

Although the Court agrees with the Goldbergs that the issues being litigated in both actions overlap substantially, because the Texas case will not necessarily result in the same relief, the Court declines to find that the two actions are parallel.  At the heart of both the Texas case and the instant action is whether certain information acquired by EMR from the Goldbergs is confidential.  The Court is not convinced by EMR's characterization of the two cases as "at best, based on much of the same history."  Doc. 65 at 23 (internal quotation and citation

29

omitted).  The two cases will necessarily turn on the same questions of fact and, in some instances, law.  EMR used the Sale Agreement as a procedural hook for seeking injunctive relief in the Texas case.  *See, e.g.*, Texas Complaint ¶ 196 ("[C]ertain of the Defendants agreed in the Sale Agreement that violations of that agreement would cause irreparable injury and consented to injunctive relief.").  And its claim for misappropriation of trade secrets will turn heavily on whether the information Ken used to start Geomet was considered confidential information under the Sale Agreement—the same question that this Court will be confronted with when determining whether specific performance of the contract is warranted.  *See, e.g.*, *id.* ¶¶ 152-161.  Yet, the fact remains that in Texas, EMR has chosen to pursue this question via actions for state-based trade secrets and other tort claims.  It has not chosen to pursue any contract claims it may have against the Goldbergs based on the Sale Agreement in that forum.  Specifically, EMR has not chosen to pursue claims for specific performance of the Sale Agreement in Texas.  Therefore, the Texas litigation is incapable of disposing of EMR's claim for specific relief.  The injunctive relief sought in Texas is, at the moment, only temporary and therefore a poor substitute for the relief sought by EMR in this action.  *Id.* ¶¶ 176-201.

For the foregoing reasons, the Court declines to abstain from the case pursuant to *Colorado River*.

### E.  Collateral Estoppel

Finally, the Goldbergs assert a collateral estoppel defense and argue that the Texas Court of Appeal's decision regarding supplier damages—or the lack thereof—bars some of EMR's claims in this lawsuit.  Doc. 110 at 6-8.  The Goldbergs allege that the Texas Court of Appeals made six "non-exhaustive fact findings [that] were essential to the Judgment's dismissal with prejudice":

1) "Portions of the record show these Defendants had access to and took information while they worked for Plaintiffs, but nothing in these pages shows Defendants used any of the materials taken from Plaintiffs after they quit their jobs with Plaintiffs." Ex. A at 28.

2) "The fact that Defendants contacted the same companies and representatives of those companies is not evidence they used trade secrets or confidential or proprietary information to do so." *Id.*

3) "Plaintiffs produced no evidence that Myers and Medina showed the lists to anyone or that they used the information themselves." *Id.* at 27.

4) "Plaintiffs presented no evidence that Defendants actually used any trade secrets or confidential or proprietary information to contact the suppliers." *Id.* at 27.

5) "Plaintiffs also failed to show that the contact information for each purchaser and supplier Defendants contacted, all of which were businesses, was not public information." *Id.* at 28.

6) Ken Goldberg resigned from EMR in 2014. Ex. A at 12. He was only prohibited from hiring EMR's employees for one year after his resignation, and his noncompete agreements expired by September 17, 2016. *Id.* at 10.

Doc. 110 at 4 (citing the Texas Court of Appeals Decision).

"The Full faith and Credit Act, 28 U.S.C. § 1738 . . . requires the federal court to give the same preclusive effect to a state-court judgment as another court of that State would give." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005) (internal quotations and citations omitted). Under Texas law, "[a] party seeking to assert the bar of collateral estoppel must establish that (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 801 (Tex. 1994). "To satisfy the requirements of due process, it is only necessary that the party *against whom* the doctrine is asserted was a party or in privity with a party in the first action." *Id.* at 802 (emphasis in original).

Here, the Goldbergs seek to estop the issue of supplier-based damages.  However, the only cause of action remaining before the Court is for specific performance.  In New York,

> To obtain specific performance, the requesting party must show:  (1) the making of the contract and its terms, including a description of the subject matter; (2) that the party is ready, willing, and able to perform the contract and has fulfilled all of his duties to date; (3) that it is within the opposing party's power to perform; and (4) that there is no adequate remedy at law . . . .

*Petrello v. White*, 412 F. Supp. 2d 215, 230-31 (E.D.N.Y. 2006).  In order to prevail on its claim for specific performance, EMR need not establish damages.  Therefore, the issue that the Goldbergs are seeking to estop is irrelevant to the remaining claim.  The Court declines to conduct an analysis of whether collateral estoppel is available as a defense to claims over which it does not currently have subject matter jurisdiction.

The Goldbergs also argue in the alternative that the Texas Appellate Court's fact findings and holding should be the law of the case.  The law of the case doctrine holds "that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case."  *U.S. v. Quintieri*, 306 F.3d 1217, 1226 (2d Cir.2002) (internal quotation marks and citations omitted); *Aramony v. United Way*, 254 F.3d 403, 410 (2d Cir. 2001).  The Court finds that the doctrine is inapplicable here where the Texas case and this one are not one and the same.  Although the Court concedes that some of the same factual questions are in dispute in both cases, that does not mean that they can be considered the same litigation.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS the Goldbergs' Motion to Dismiss as to Counts I-II and DENIES the motion as to Count III.  The parties are directed to appear for a status conference on October 29, 2019 at 10:00 AM.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 44, 110.

SO ORDERED.

Dated:    September 27, 2019
          New York, New York

Edgardo Ramos, U.S.D.J.

33